UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
RICKY BATTLE,                                      :
                              Plaintiff,           :
                                                   :        **<u>OPINION AND ORDER</u>**
 v.                                                :
                                                   :        14 CV 2738 (VB)
MONICA RECKTENWALD, HOWARD            :
HUFFORD, DIANA SOMMER, CHESTER        :
McKINNEY, and JAYNE VANDER HEY-       :
WRIGHT,                                             :
                              Defendants.           :
--------------------------------------------------------------x
<u>Briccetti, J.</u>:

 Plaintiff Ricky Battle, an inmate proceeding <u>pro se</u>, brings civil rights claims alleging

defendants were deliberately indifferent to his serious medical needs.  Defendants Monica

Recktenwald, Howard Hufford, Diana Sommer, Chester McKinney, and Jayne Vander Hey-

Wright are employees or former employees of the Bureau of Prisons at the Federal Correctional

Institution-Otisville ("FCI Otisville").

 Defendant Vander Hey-Wright moves to dismiss the complaint for lack of subject matter

jurisdiction under Federal Rule of Civil Procedure 12(b)(1).  The remaining defendants move for

summary judgment.  (Doc. #50).

 For the reasons set forth below, defendants' motions are GRANTED.

 The Court has jurisdiction under 28 U.S.C. § 1331.

**BACKGROUND**

 The following facts are undisputed.[1]

---

[1] Although he was served with the required notices to <u>pro se</u> litigants pursuant to Local
Civil Rules 12.1 and 56.2 (Docs. ## 63, 64), plaintiff did not submit a formal opposition to
defendants' motion and did not submit a Local Civil Rule 56.1 statement..  When, as here, a non-
movant fails to address the movant's assertion of material fact, the court may "consider the fact
undisputed for purpose of the motion."  Fed. R. Civ. P. 56(e)(2).

On September 12, 2003, plaintiff was sentenced to a 32-year prison term.  From November 15, 2007, to September 18, 2014, plaintiff was housed at FCI Otisville.

Plaintiff has several chronic medical conditions, including asthma, hepatitis B, herpes, hypertension, arterial sclerosis, anemia, esophagus reflux, ulcerous colitis, chest pain associated with triple-bypass surgery, and HIV.  On February 10, 2013, plaintiff went to the prison health clinic complaining of chest pain, stomach pain, and shortness of breath.  He had swollen parotid glands, causing pain in his ear and mouth.  Because plaintiff appeared to have symptoms of a cold, medical staff gave him a misty nebulizer for asthma, and prednisone, a steroid.

The next day, Dr. Sommer, the clinical director of the health service unit at FCI Otisville, saw plaintiff for follow-up treatment.  Dr. Sommer prescribed an antibiotic, issued an inhaler, and ordered chest x-rays.

On February 14 and February 21, 2013, Dr. Sommer saw plaintiff to monitor his condition.  Plaintiff's glands remained swollen and he continued to have a cough and chest congestion.  Dr. Sommer attributed this to plaintiff's immuno-compromised HIV-positive status.  Dr. Sommer ordered a sinus x-ray and laboratory work.  On February 23, 2013, medical staff gave plaintiff an injection of an anti-inflammatory drug.  On March 1, 2013, Ms. Vander Hey-Wright, a physician's assistant at FCI Otisville, informed plaintiff his x-rays showed no significant findings.  She advised plaintiff to continue his course of treatment.

Plaintiff's symptoms persisted, and on May 17, 2013, Dr. Sommer referred him to a consulting doctor specializing in diseases of the ear, nose, and throat.  On May 23, 2013, the consulting doctor examined plaintiff and found the inflammation of his parotid glands was likely related to his HIV.  The consulting doctor recommended treatment with a different antibiotic

than the one Dr. Sommer previously prescribed.  Dr. Sommer prescribed plaintiff the recommended antibiotic.

On June 4, 2013, medical staff evaluated plaintiff for complaints of diarrhea and hemorrhoids.  Ms. Vander Hey-Wright prescribed loperamide for the diarrhea and hydrocortisone suppositories for the hemorrhoids.  She also advised plaintiff to increase his fluid intake and complete the course of antibiotics as recommended by the consulting ear, nose, and throat doctor.  In mid-June, the medical staff monitored plaintiff every few days for the effectiveness of the antibiotic treatment.  Based on the recommendation of the consulting doctor, Dr. Sommer renewed plaintiff's antibiotic prescription.

On July 11, 2013, plaintiff returned to the health clinic complaining of ear pain, abdominal pain, nausea, diarrhea, and chest pain.  Dr. Sommer concluded plaintiff could not receive another course of antibiotics because they were causing another condition, plaintiff's ulcerous colitis, to worsen.  Dr. Sommer prescribed a course of prednisone and ear drops to relieve pain.  On July 17, 2013, Dr. Sommer ordered a CT scan of plaintiff's neck to rule out other causes of plaintiff's conditions.  The test results indicated plaintiff's parotid glands were normal.

Plaintiff continued to complain about his ear condition[2] and on August 13, 2013, Ms. Vander Hey-Wright examined his ear.  Plaintiff described his pain as a ten on a scale of zero to ten.  But his ear appeared normal to Ms. Vander Hey-Wright.  She explained she could not provide additional treatment at that time.  Dr. Sommer evaluated plaintiff's ear condition and

---

[2]     Plaintiff alleges he emailed Dr. Sommer details about his medical issues on August 5, 2013, and her response reflected the medical staff "did not know what his medical conditions were," and "[t]here were assumptions about whether the swollen glands were [a part] of the [HIV] disease but that was not to a medical certainty."  (Compl. ¶ 4).

confirmed Ms. Vander Hey-Wright's finding that plaintiff's ear was normal and plaintiff did not appear to have extreme pain. Based on this conclusion, Dr. Sommer advised plaintiff to take acetaminophen to control his pain. However, Dr. Sommer requested another consultation with an ear, nose, and throat doctor to assess plaintiff's pain.[3]

Twelve days later, on August 26, 2013, plaintiff presented to the health clinic with signs of severe pain in his ears, head, and jaws. Unlike the prior consultation, Dr. Sommer found plaintiff's demeanor to be consistent with significant pain. She believed plaintiff had temporal arteritis, a disease causing inflammation to the arteries supplying blood to the head. If untreated, temporal arteritis can lead to vision loss, but a course of steroids typically resolves the disease's symptoms within a few days. Dr. Sommer prescribed an intravenous steroid to reduce the swelling of the arteries, and morphine to reduce pain.

Within a few hours of receiving the treatment, plaintiff's symptoms subsided. Dr. Sommer instructed plaintiff to return to the health clinic immediately if he experienced any vision changes. The next day, plaintiff told Dr. Sommer his pain was reduced.

Two days later, plaintiff complained of pain in the left side of his head and requested new pain medication. Dr. Sommer prescribed a seven-day course of oxycodone. After seven days, plaintiff complained to Dr. Sommer of new joint and muscle pain. Dr. Sommer noted plaintiff's pain level seemed attenuated. Nevertheless, she prescribed a morphine injection to be administered two times per day for five days, and referred plaintiff to an outside vascular surgeon to confirm whether plaintiff had developed temporal arteritis.

---

[3]     Plaintiff alleges "the referral either was not necessary, or should have been expedited, because the wait clearly caused more damage and pain." (Compl. ¶ 6). Plaintiff filed the first of four administrative grievances on August 15, 2013, seeking a definitive diagnosis and treatment. (Scannell-Vessella Decl., Ex. 3). Plaintiff attempted to exhaust this grievance by submitting three appeals. (Scannell-Vessella Decl., Exs. 4-6).

After one day of injections, plaintiff complained the morphine was not helping his pain. Ms. Vander Hey-Wright consulted Dr. Sommer and increased plaintiff's steroid prescription. On September 9, 2013, after four days of morphine injections, Dr. Sommer prescribed oxycodone for plaintiff to take twice daily for fourteen days.

On September 10, 2013, the vascular oral surgeon evaluated plaintiff. The surgeon concurred with Dr. Sommer's diagnosis of temporal arteritis and her treatment plan. The surgeon ordered a biopsy for October 3, 2013, to confirm the diagnosis.[4]

However, before the biopsy could occur, on September 17, 2013, plaintiff went to the health clinic complaining of blurry vision and swelling on the left side of his head. He was transferred to a hospital emergency room where he received an MRI and CT scan. The hospital physicians diagnosed plaintiff with temporal arteritis. They also diagnosed plaintiff with carotid artery stenosis, a disease unrelated to the temporal arteritis involving the narrowing of the arteries that supply the head and neck with blood.

After two days, the hospital discharged plaintiff. He began experiencing blurred vision and other symptoms of Bell's palsy. Bell's palsy is an ailment, unrelated to temporal arteritis or carotid artery stenosis, which causes weakness or paralysis of the nerves on one side of the face, interfering with facial functioning. On the day he was discharged from the hospital, an ophthalmologist examined plaintiff for Bell's palsy. The ophthalmologist diagnosed him with Bell's palsy, prescribed eye drops, and instructed plaintiff to tape his eye shut to sleep. Dr. Sommer also prescribed prednisone and acyclovir, an antiviral drug.

---

[4]    Plaintiff alleges he filed an administrative grievance on September 13, 2013, "requesting that the warden Order medical staff to immediately treat his debilitating condition and that he was suffering while no course of action was taken to address his pressing needs." (Compl. ¶ 13). This appears to be an appeal of his first grievance. (Scannell-Vessella Decl., Ex. 4, at 2230). See infra n. 3.

5

On October 2, 2013, the outside surgeon canceled plaintiff's biopsy, which was scheduled for the following day.  Dr. Sommer noted in plaintiff's record that the surgeon did not want to reschedule the biopsy because "by the time it will be rescheduled, [the biopsy would be] unlikely to be positive after the steroid usage."  (Cowart Decl., Ex. 2 at G1259).  In other words, plaintiff's steroid treatment meant the biopsy could not reliably diagnose temporal arteritis.[5]

Two days later, plaintiff complained of high levels of pain in his left ear.  Ms. Vander Hey-Wright evaluated him and ordered an x-ray of his neck and an extension of plaintiff's pain medication.  The following day, Dr. Sommer prescribed oxycodone, once daily for three days.  She applied for approval to use a non-formulary form of oxycodone and then changed the prescription to the new, non-formulary form of oxycodone with one pill a day for seven days.

On October 10, 2013, an x-ray of plaintiff's back revealed degenerative changes in his neck.  Two days later, Dr. Sommer prescribed Percocet twice daily for three days to begin when plaintiff's oxycodone prescription ended.[6]

On October 18, 2013, Dr. Sommer reviewed plaintiff's overall medical treatment with him.  She noted in his record that he had already been referred to a neurologist for a follow-up

---

[5]     With respect to one of his administrative grievances, plaintiff alleges "Warden Hufford did not deny [plaintiff's] complaint, as indicated by his response.  However, there was never [a] follow-up to determine [plaintiff's] condition."  (Compl. ¶ 15).  Although it is unclear which of the four administrative grievances plaintiff is referencing, it appears plaintiff is referring to the biopsy the surgeon cancelled.

[6]     Plaintiff alleges Ms. Vander Hey-Wright "inform[ed] [plaintiff] that Dr. Sommer instructed her to give him 'one' pain pill in the morning, afternoon, and 'two' at night.  However, very quickly the pain medication was discontinued."  (Compl. ¶ 10).  Plaintiff was prescribed narcotic pain medication on twenty-seven different occasions during the relevant time period.  (Walls Decl., Ex. 2).  Plaintiff does not identify to which prescription he refers when he alleges the pain medication was very quickly discontinued.   (Compl. ¶ 10).

appointment.[7]  Dr. Sommer again prescribed oxycodone three times per day for five days.  Four

days later, she renewed his oxycodone prescription for seven days.

On October 28, 2013, plaintiff emailed Dr. Sommer to inform her he did not receive his

pain medication in the prison pill line.  Dr. Sommer replied to plaintiff's email saying "[w]ho

ever works [on the] pill line can call me."  (Cowart Decl., Ex. 2 at G1227).  The same day,

plaintiff went to the health clinic complaining of increased pain in the left side of his head.  Dr.

Sommer ordered a one-time morphine injection.

Two days later, Ms. Vander Hey-Wright assessed plaintiff's progress.  Vander Hey-

Wright consulted with Dr. Sommer, who renewed plaintiff's pain medication.  But again,

plaintiff experienced extreme pain the next day.  Ms. Vander Hey-Wright noted in plaintiff's

records that "there is no explanation as to the cause of this pain" given he had been seen by

several specialists and undergone several different procedures.[8]  (Cowart Decl., Ex. 2 at G1219).

On November 10, 2013, plaintiff's Percocet prescription expired and Dr. Sommer

renewed it for three days.  Three days later, Dr. Sommer prescribed oxycodone for ten days.

---

[7]     As to his October 18, 2013, consultation with Dr. Sommer, plaintiff alleges "[s]he informed him that she was going to send him out to get the problem fixed.  It did not happen.  As of this complaint, she still has not sent him out." (Compl. ¶ 11) (emphasis in original).  However, the record belies plaintiff's allegation.  Dr. Sommer referred plaintiff to outside specialists on several occasions, both before and after October 18, 2013.  In this instance, plaintiff's medical records reflect he was examined by an outside neurologist the following month.

[8]     Plaintiff filed his second of four administrative grievances on or about November 7, 2013.  (Scannell-Vessella Decl., Ex. 7).  Plaintiff stated he was in pain and "they are not doing anything about it."  (Id. at G2235).  Mr. McKinney, FCI Otisville's Health Services Administrator, responded to the grievance, explaining plaintiff had an appointment scheduled with a neurologist.  Plaintiff alleges "[t]he facts demonstrate that the appointment never materialized."  (Compl. ¶ 12).  However, the record reflects plaintiff was examined by a neurologist on November 19, 2013.  Plaintiff filed three subsequent appeals of this administrative grievance.  (Scannell-Vessella Decl., Exs. 8-10).

On November 18, 2013, plaintiff went to the health clinic complaining of pain on both sides of his face.  He reported the pain to be a ten on a ten-point scale.  Ms. Vander Hey-Wright noted in plaintiff's record that he was "comfortably sitting in the chair and carrying on a normal conversation," indicating that his pain was not as extreme as he reported.  (Cowart Decl., Ex. 2 at G1203).  The following day, a neurologist evaluated plaintiff and recommended he continue prednisone and undergo two tests for possible peripheral neuropathy, or nerve damage.

On November 21, 2013, plaintiff complained his hands and feet were cramping.  Dr. Sommer examined plaintiff and prescribed a muscle relaxant and oxycodone for thirty days.  Dr. Sommer also renewed plaintiff's prescription for artificial tears and eye ointment to treat his Bell's palsy.

One month later, plaintiff's Percocet prescription was renewed for two days.  After two days, Dr. Sommer prescribed oxycodone for fourteen days.

Ms. Vander Hey-Wright examined plaintiff on January 7, 2014, and plaintiff informed her he "gets relief from the [P]ercocet."  (Cowart Decl., Ex. 2 at G1831).  The following week, an optometrist evaluated plaintiff and noted no changes in his vision.  The optometrist recommended plaintiff continue using the eye drops and ointment.

On February 3, 2014, plaintiff informed Ms. Vander Hey-Wright that his pain had worsened.  He complained of pain in his back, leg, and hand, and expressed concern his fingernails were deteriorating.  Plaintiff requested trigger point injections for pain relief, which Ms. Vander Hey-Wright approved.  Plaintiff also received a transcutaneous electrical stimulation unit ("TENS") for pain relief.[9]

---

[9]    A TENS unit is a portable device that sends electrical impulses to the body to block pain signals to the brain.

Dr. Sommer renewed plaintiff's prescription for oxycodone three times during the first half of February.  On February 18, 2014, Ms. Vander Hey-Wright evaluated plaintiff for back pain, and plaintiff informed her his treatment doses were "helping to keep the pain at a level he can deal with."  (Cowart Decl., Ex. 2 at G1799).

On March 4, 2014, plaintiff received four trigger point injections.[10]

On March 12, 2014, an oral surgeon evaluated plaintiff for temporomandibular joint disorder, or problems with his jaw and the muscles in his face.  The surgeon gave him mouth exercises to perform to lessen his symptoms.

On March 20, 2014, plaintiff went to a follow-up appointment with the outside neurologist who treated plaintiff in November 2013.  The neurologist noted plaintiff's Bell's palsy was "improved."  (Walls Decl., Ex. 1 at G1958).

On March 30, 2014, Dr. Sommer renewed plaintiff's prescription for oxycodone.  The following day, Ms. Vander Hey-Wright examined plaintiff for pain.  Once again, plaintiff informed her "the medication is effective in helping to relieve his pain" and stated he had no new symptoms.  (Cowart Decl., Ex. 2 at G1764).  Ms. Vander Hey-Wright renewed the oxycodone prescription.

---

[10]     On March 10, 2014, plaintiff filed his third of four administrative grievances, arguing he was receiving "medically negligent" care and was subjected to a drug test in retaliation for filing prior grievances.  (Scannell-Vessella Decl., Ex. 11 at G2217).  Warden Recktenwald responded on March 19, 2014 outlining the treatment plaintiff had received to date, and explaining the drug test policy with respect to inmates receiving prescription narcotics.  (Id. at 2219).  Plaintiff did not appeal this grievance.

On April 15, 2014, plaintiff commenced this lawsuit, alleging defendants intentionally neglected him and the staff took "no course of action" to remedy his health problems.  (Compl. ¶ 13).[11]

Defendants filed the instant motion to dismiss and motion for summary judgment on May 19, 2015.  (Doc. #50).  On June 23, 2015, defendants served notices pursuant to Local Civil Rules 12.1 and 56.2.  (Docs. ##63, 64).  Plaintiff did not file a formal opposition to defendants' motions, despite being given two lengthy extensions to do so (Docs. ##61, 66), but on October 9, 2015, he filed a one-page letter containing some information about his temporal arteritis and Bell's palsy.  (Doc. #67).[12]

## DISCUSSION

I.   Legal Standards

A.   Rule 12(b)(1) Standard

"[F]ederal courts are courts of limited jurisdiction and lack the power to disregard such limits as have been imposed by the Constitution or Congress."  Durant, Nichols, Houston, Hodgson, & Cortese-Costa, P.C. v. Dupont, 565 F.3d 56, 62 (2d Cir. 2009) (internal quotation marks omitted).  "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it."

---

[11]   On June 9, 2014, plaintiff filed his fourth and final administrative grievance, claiming Ms. Vander Hey-Wright "'denied' [him] his right to medical attention when he arrived at sick-call on June 2, 2014."  (Scannell-Vessella Decl., Ex. 12 at G2220).  Plaintiff does not specifically refer to this event in his complaint.  Plaintiff filed two appeals of this grievance.  (Scannell-Vessella Decl., Ex. 13-14).

[12]   In his letter, plaintiff states his "contention is that the delay in diagnosis of Temporal Arteritis led to Parotitis and Bell's palsy.  This series of events was preventable and had the cause of headaches been ascertained the year long period in which they continued."  (Doc. #67 at 1).  He attributes the loss of function in his facial muscles to "lack of attention [to] detail or failure to make an appropriate diagnosis."  (Id.).

Nike, Inc. v. Already, LLC, 663 F.3d 89, 94 (2d Cir. 2011) (internal quotation marks omitted). The party invoking the Court's jurisdiction bears the burden of establishing jurisdiction exists. Conyers v. Rossides, 558 F.3d 137, 143 (2d Cir. 2009).

When a party raises a "factual" challenge to jurisdiction, as defendant Vander Hey-Wright does here, the Court may refer to evidence outside the pleadings, Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000), and "retains considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction." APWU v. Potter, 343 F.3d 619, 627 (2d Cir. 2003) (internal quotation marks omitted).

The Court must liberally construe submissions of pro se litigants, and interpret them "to raise the strongest arguments that they suggest." Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam) (internal quotation marks and citation omitted). Applying the pleading rules permissively is particularly appropriate when, as here, a pro se plaintiff alleges civil rights violations. See Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191 (2d Cir. 2008). "Even in a pro se case, however . . . threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Chavis v. Chappius, 618 F.3d 162, 170 (2d Cir. 2010) (internal quotation marks and citation omitted). Nor may the Court "invent factual allegations" plaintiff has not pleaded. Id.

B.    Summary Judgment Standard

The Court must grant a motion for summary judgment if the pleadings, discovery materials before the Court, and any affidavits show there is no genuine issue as to any material fact and it is clear the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp v. Catrett, 477 U.S. 317, 322 (1986).

A fact is material when it "might affect the outcome of the suit under the governing law . . . .  Factual disputes that are irrelevant or unnecessary" are not material and thus cannot preclude summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute regarding a material fact is genuine if there is sufficient evidence upon which a reasonable jury could return a verdict for the non-moving party.  See id.  The Court "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried."  Wilson v. Nw. Mut. Ins. Co., 625 F.3d 54, 60 (2d Cir. 2010) (citation omitted).  It is the moving party's burden to establish the absence of any genuine issue of material fact.  Zalaski v. City of Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir. 2010).

If the non-moving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, then summary judgment is appropriate.  Celotex Corp. v. Catrett, 477 U.S. at 323.  If the non-moving party submits evidence which is "merely colorable," summary judgment may be granted.  Anderson v. Liberty Lobby, Inc., 477 U.S. at 249-50.  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation."  Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011) (internal citations omitted).  The mere existence of a scintilla of evidence in support of the non-moving party's position is likewise insufficient; there must be evidence on which the jury could reasonably find for him.  Dawson v. Cty. of Westchester, 373 F.3d 265, 272 (2d Cir. 2004).

On summary judgment, the Court resolves all ambiguities and draws all permissible factual inferences in favor of the non-moving party.  Nagle v. Marron, 663 F.3d 100, 105 (2d Cir. 2011).  If there is any evidence from which a reasonable inference could be drawn in favor

of the opposing party on the issue on which summary judgment is sought, summary judgment is improper.  See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc., 391 F.3d 77, 83 (2d Cir. 2004).

II.     Inadequate Medical Care

Construed liberally, the pro se plaintiff's complaint could be asserting claims under (i) Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971), or (ii) state law tort claims for negligence or medical malpractice.

        A.     Bivens Claims

"A Bivens action is a judicially-created remedy designed to provide individuals with a cause of action against federal officials who have violated their constitutional rights."  Higazy v. Templeton, 505 F.3d 161, 169 (2d Cir. 2007).  For liability to attach, Bivens defendants must be personally involved such that "through their own actions, they satisfy each element of the underlying constitutional tort."  Turkmen v. Hasty, 789 F.3d 218, 250 (2d Cir. 2015).

In the context of inadequate medical care, to assert a viable claim, plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."  Estelle v. Gamble, 429 U.S. 97, 106 (1976).  This test has both an objective and a subjective component: plaintiff must plead facts showing (i) the alleged deprivation of medical care is "sufficiently serious," and (ii) the officials in question acted with a "sufficiently culpable state of mind."  Salahuddin v. Goord, 467 F.3d 263, 279-80 (2d Cir. 2006).

To satisfy the objective component, a condition is sufficiently serious if it may cause "death, degeneration, or extreme pain," Johnson v. Wright, 412 F.3d 398, 403 (2d Cir 2005) (quoting Hemmings v. Gorsczyk, 134 F.3d 104, 108 (2d Cir. 1998)), or if "the failure to treat [the] condition could result in further significant injury or the unnecessary and wanton infliction

13

of pain." Harrison v. Barkley, 219 F.3d 132, 136 (2d Cir. 2000) (quoting Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998)).

To satisfy the subjective component, a plaintiff must allege the defendant had a mental state akin to recklessness, which "requires that the charged official act[ed] or fail[ed] to act while actually aware of a substantial risk that serious inmate harm will result." Salahuddin v. Goord, 467 F.3d at 280 (citing Farmer v. Brennan, 511 U.S. 825, 836-37 (1994)). Plaintiff must allege "something more than mere negligence . . . [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." Farmer v. Brennan, 511 U.S. at 835. For example, "a deliberate indifference claim can lie where prison officials deliberately ignore the medical recommendations of a prisoner's treating physicians." Johnson v. Wright, 412 F.3d at 404 (citing Gill v. Mooney, 824 F.2d 192, 196 (2d Cir. 1987)).

Assuming, without deciding, that plaintiff exhausted his administrative remedies before filing suit,[13] the Court addresses plaintiff's Bivens claim as to each defendant.

     1.    Vander Hey-Wright

Plaintiff's claims against Vander Hey-Wright, a physician assistant and member of the Public Health Service ("PHS"), must be dismissed for lack of subject matter jurisdiction.

---

[13]    The Prison Reform Litigation Act states in relevant part: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532 (2002). Although defendants argue certain of plaintiff's administrative grievances were not fully exhausted, the Court assumes, without deciding, plaintiff did fully exhaust his administrative grievances because, as discussed below, the Court dismisses or grants summary judgment to defendants on substantive grounds.

The Public Health Service Act ("PHSA") provides that a claim against the United States under the Federal Tort Claims Act ("FTCA") is the exclusive remedy for claims caused by the acts or omissions of PHS employees acting within the scope of their employment.  42 U.S.C. § 233(a); Hui v. Castaneda, 559 U.S. 799 (2010) (holding the PHSA precludes Bivens actions against PHS employees for claims arising out of the performance of their medical functions related to their employment).

Here, there is no dispute regarding Ms. Vander Hey-Wright's employment status as a PHS member.  Plaintiff argues she "did absolutely nothing" when he reported a painful medical condition.  (Compl. at ¶ 10).  Therefore plaintiff's allegations concern Ms. Vander Hey-Wright's "performance of medical . . . functions . . . while acting within the scope of [her] office or employment" as a physician assistant.  42 U.S.C. § 233(a).  Accordingly, plaintiff's only method of redress against Vander Hey-Wright is to file suit against the United States under the FTCA. See Cuoco v. Moritsugu, 222 F.3d 99, 113 (2d Cir. 2000) (instructing district court to enter summary judgment for defendants on absolute immunity grounds pursuant to 42 U.S.C. § 233(a)); Adekoya v. Holder, 751 F. Supp. 2d 688, 693-94 (S.D.N.Y. 2010) (dismissing plaintiff's claims against PHS defendants for lack of subject matter jurisdiction).[14]

---

[14]    The complaint makes no mention of the FTCA.  However, to the extent plaintiff brings an FTCA claim, it is dismissed.  First, a plaintiff may not sue federal employees such as defendant Vander Hey-Wright under the FTCA; rather, the United States must be named as the defendant.  See Pierre v. Napolitano, 958 F. Supp. 2d 461, 487 (S.D.N.Y. 2013).  Plaintiff did not sue the United States in the instant action.  Second, even assuming plaintiff had properly named the United States as a defendant, plaintiff's FTCA claim would still fail because nothing in the complaint suggests he exhausted his administrative remedies by filing a claim with the appropriate federal agency.  See 28 U.S.C. § 2675(a) (the FTCA requires that before a claimant may initiate an action against the United States, "the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied."); Adeleke v. United States, 355 F.3d 144, 153 (2d Cir. 2004) (FTCA's administrative exhaustion requirement "applies equally to litigants with counsel and to those proceeding pro se").  Accordingly, any FTCA claim raised in the complaint is dismissed.

2.      Sommer

Defendants argue Dr. Sommer is entitled to summary judgment because she is qualifiedly immune.

The Court agrees.

A government official is entitled to qualified immunity for actions taken as a government official if (i) the conduct is not prohibited by federal law; (ii) the plaintiff's right was not clearly established at the time of the conduct, or (iii) the official's action was objectively legally reasonable in light of the legal rules that were clearly established at the time the action was taken.  Cuoco v. Moritsugu, 222 F.3d at 109.  These issues should be approached in sequence; if the first is resolved in favor of the official, both the second and third become moot.  See Rohman v. N.Y.C. Transit Auth., 215 F.3d 208, 216 n.4 (2d Cir. 2000).

Plaintiff's Bivens claim against Dr. Sommer does not survive the first criterion for qualified immunity because Dr. Sommer's conduct did not violate federal law.

Plaintiff failed to allege any facts showing Dr. Sommer acted with the requisite mental state to satisfy the subjective component of an Eighth Amendment claim for inadequate medical treatment.[15]  Plaintiff's allegations as to Dr. Sommer are that he complained of his pain to her but he still experienced ongoing pain, and she told him he would send him to an outside doctor but did not, causing him to suffer and develop additional conditions.  Construed liberally, the crux of plaintiff's allegations is (i) Dr. Sommer should have done more to diagnose his ailments sooner; (ii) a different course of treatment should have been provided; or (iii) Dr. Sommer was unable to treat his conditions effectively.

---

[15]     Defendants do not dispute plaintiff's medical conditions are sufficiently serious to satisfy the objective prong of a deliberate indifference claim.

Given the undisputed extensive medical record evidencing Dr. Sommer's extensive and persistent treatment of plaintiff, none of these theories can support a deliberate indifference claim as to Dr. Sommer.

First, a delay in treatment does not necessarily invoke a deliberate indifference claim, especially when, as here, any delays were caused by intervening medical problems or difficulties in scheduling outpatient appointments.  Henderson v. Sommer, 2011 WL 1346818, at *4 (S.D.N.Y. Apr. 1, 2011) (granting summary judgment as to plaintiff's Eighth Amendment claim because the delay in surgery resulted from a third-party's scheduling constraints); Pizarro v. Gomprecht, 2013 WL 990998, at *14 (E.D.N.Y. Feb. 13, 2013) report and recommendation adopted, 2013 WL 990997 (E.D.N.Y. Mar. 13, 2013) (delay in referring inmate for treatment was medically justified because the condition was likely a side effect of plaintiff's HIV medication and the treatment was likely to be unsuccessful).[16]  More fundamentally, plaintiff failed to allege Dr. Sommer caused any delay in plaintiff's treatment while aware of a substantial risk of harm to plaintiff.

Second, to the extent plaintiff's contentions amount to a disagreement over the treatment he received, that alone does not create a constitutional claim.  Chance v. Armstrong, 143 F.3d at 703 ("So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation."); see also Hill v. Curcione, 657 F.3d 116, 123 (2d Cir. 2011) ("Issues of medical judgment cannot be the basis of a deliberate indifference claim where evidence of deliberate indifference is lacking.").  Importantly, plaintiff

---

[16]    Plaintiff will be provided with copies of all unpublished opinions cited in this decision. See Lebron v. Sanders, 557 F.3d 76, 79 (2d Cir. 2009).

failed to show Dr. Sommer intentionally advised an improper treatment method or advised a course of treatment while aware that such treatment carried a substantial risk of harm to plaintiff.

Third, to the extent plaintiff contends Dr. Sommer was unable to treat his conditions effectively, this too does not establish a constitutional violation.  Bryant v. Wright, 451 F. App'x 12, 14 (2d Cir. 2011) ("The bare allegation that the treatments have so far been unsuccessful is insufficient to state a claim for deliberate indifference.").

The undisputed record reflects that each time plaintiff complained of symptoms, Dr. Sommer promptly provided him with treatment responsive to his symptoms.  When he complained the course of treatment was not working, Dr. Sommer followed up to find new diagnoses, try new medication, or refer him to consulting physicians to address his complaints. Thus, while Dr. Sommer seems to have been "aware of a substantial risk that serious inmate harm will result" if she failed to act, plaintiff failed to show Dr. Sommer intentionally rendered improper treatment or knew of and disregarded a substantial risk of serious harm to plaintiff. See Salahuddin v. Goord, 467 F.3d at 280.

Accordingly, Dr. Sommer is entitled to summary judgment.

3.     Non-medical Staff

Defendants argue the non-medical staff members – Warden Recktenwald, Warden Hufford, and Mr. McKinney – are entitled to summary judgment because they are qualifiedly immune.

The Court agrees.

Like Dr. Sommer, these defendants are entitled to qualified immunity because no conduct attributed to them is prohibited by federal law.  See Cuoco v. Moritsugu, 222 F.3d at 109.

A defendant's denial of an administrative grievance or a refusal to override the medical advice of medical personnel are insufficient to establish liability for an Eighth Amendment violation.  See Graham v. Wright, 2003 WL 22126764, at *1 (S.D.N.Y. Sept. 12, 2003) ("It is well established that supervisory officials are generally entitled to delegate medical responsibility to facility medical staffs and are entitled to rely on the opinion of medical staff concerning the proper course of treatment.") (quotation marks omitted); Joyner v. Greiner, 195 F. Supp. 2d 500, 506 (S.D.N.Y. 2002) ("[A] prison administrator is permitted to rely upon and be guided by the opinions of medical personnel concerning the proper course of treatment administered to prisoners.").  This rule is grounded in the principle that a plaintiff must allege defendants' personal involvement in the claimed violation of his rights.  Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (identifying five ways in which a plaintiff may establish a supervisory defendant's personal involvement with an alleged constitutional violation).

Here, plaintiff argues Warden Recktenwald, Warden Hufford, and Mr. McKinney were deliberately indifferent to his medical problems because they knew of the medical staff's inability to treat him effectively, but took no action to remedy the situation.  Plaintiff alleges Warden Recktenwald failed to help him obtain adequate medical treatment after he filed an administrative grievance, which permitted the medical staff to continue their deliberate indifference towards him.  Plaintiff alleges Warden Hufford failed to direct medical staff to diagnose and treat his medical conditions, which emboldened the medical staff to leave plaintiff in distress.  Plaintiff alleges Mr. McKinney responded to a message from plaintiff by referencing a neurologist appointment that allegedly never occurred.

Plaintiff has not alleged any facts showing defendants Recktenwald, Hufford, or McKinney were personally involved in the alleged constitutional violation, either directly or in a

19

supervisory fashion.  Colon v. Coughlin, 58 F.3d at 873.  Plaintiff's complaint merely states these defendants responded to or denied plaintiff's administrative grievances based on the opinions of medical personnel.  Plaintiff does not allege these defendants had reason to distrust the competence of the medical staff.  Cf. Smiley by Smiley v. Westby, 1994 WL 519973 at *8 (S.D.N.Y. Sept. 22, 1994) (denying summary judgment because the prison warden had reason to believe that medical staff was deficient)).

Thus, Warden Recktenwald, Warden Hufford, and Mr. McKinney are entitled to summary judgment because they were entitled to rely on the judgment of the medical staff about the efficacy of the course of plaintiff's treatment, and plaintiff otherwise failed to allege their personal involvement in the alleged constitutional violations.

B.      State Law Claims

Construed liberally, plaintiff's complaint also contains state law tort claims for medical malpractice or negligence.  (Compl. ¶ 24) ("Mr. Battle asserts that he suffered greatly as a direct result of medical negligence.").  Having dismissed or granted summary judgment on plaintiff's federal claims, the Court declines to exercise supplemental jurisdiction over any state law claims in plaintiff's complaint pursuant to 28 U.S.C. § 1367(c)(3).

**CONCLUSION**

Defendant Vander Hey-Wright's motion to dismiss for lack of subject matter jurisdiction is GRANTED.

Defendants Sommers, Recktenwald, Hufford, and McKinney's motion for summary judgment is GRANTED as to plaintiff's Eighth Amendment claim for deliberate medical indifference.  The Court declines to exercise supplemental jurisdiction over any state law claims contained in plaintiff's complaint.

The Clerk is instructed to terminate the motion and close the case.  (Doc. #50).

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore in forma pauperis status is denied for the purpose of an appeal.  See Coppedge v. United States, 369 U.S. 438, 444-45 (1962).

Dated:  February 19, 2016
        White Plains, NY

                              SO ORDERED:



                              _____
                              Vincent L. Briccetti
                              United States District Judge